Okay, the next case is Zang v. McKee. And is it Mr. Percy? Brieka. Brieka. I apologize, Mr. Brieka. And Mr. Wuller? Sir, would you proceed when you're ready? Very brief description of facts, Your Honor. I'm Bob Brieka and I represent the plaintiff in this case, Terry Zang. This is a medical malpractice case. The basic issue as far as what the malpractice was, I had a lady, a very large lady, that had a breast reduction surgery. The doctor in his pre-op report at the hospital stated he was going to take 1,000 grams off of each side, which is roughly about 2.2 pounds. This lady had approximately 6 pounds on each side, and the end result was he took all 12 pounds.  There was this consent to do surgery, though. We're not saying that she did not consent to have the surgery done. It was the informed consent about the ramifications. There's testimony by my client that she was told and her husband told up at an office in Litchfield that she was going to end up with a beak up, possibly C cup. Anyway, the trial is on that, and removal of excessive tissue and breach are not really fulfilling the informed consent. Now, the three issues that I'm addressing with you today that's in the brief is Dr. Beatty was a treater after the fact for a short time that she consulted after this all took place. For whatever reason, the defense took Dr. Beatty's evidence deposition on 6-24-8 as their witness, you know, approximately a little bit less than a year before trial. So since they noticed him up as their witness and evidence, I tried to cross-examine, which I did in the deposition, but when we got to trial, Judge Matosian ruled that I could not use him as a witness in the case. There's some argument in the brief that he said I could use this and I could use that. That's simply not true because on page 8 of the record, and it would have been the October 1st record, Judge Matosian clearly says that I cannot use him as a witness. It's page 8, lines 2 and 3. Dr. Beatty was barred as a witness in this case, and I was doing my offer of proof, which was basically just putting the evidence deposition of Dr. Beatty in evidence. Judge Matosian's ruling on that issue I think is in conflict with two Supreme Court rules. The Supreme Court rule 212B basically says any party can present the evidence deposition if the party that, you know, propounded it decides not to use it or any part thereof. So that's one, and section 213G, which I think he was at odds with because when I cross-examined, Judge Matosian said, well, you can't get that in the brief because you didn't disclose it. Well, he's not my witness, and 213G basically says the examining party can elicit information, including opinions from that witness, that are not disclosed. There's no restriction on cross for me because they called him as his witness. There's a case I think I cited in my brief that puts it pretty succinctly. It says if a cross-examiner to use a cliche must telegraph his punch, cross-examination would lose its effectiveness. If complete disclosure is the optimum, would it not be more in the spirit of full disclosure to require a cross-examiner to submit his question to the opponent's witness before trial by eliminating spontaneity, though they say we might be eliminating truth, and that's, I just think he's in conflict with both those two Supreme Court rules not allowing me to use his evidence deposition. I was even calling this a rebuttal witness lie, and I was precluded from doing that with my understanding of what Judge Matos's ruling was, and again, that's on page 8 of the October 1st transcript, lines 2 and 3. Let me ask you this. Clearly you wanted Dr. Beatty's evidence before the jury because it supported your client. Correct. Correct? Correct. Did you make an offer of proof when that was barred? Correct. Well, when he barred it, I said, Your Honor, can I make my offer of proof? And we did that like a few minutes later on the record. He allowed me to make my offer of proof because he barred me from using the deposition or the witness. Okay. What about this contention from the defense that they had agreed to go over Dr. Beatty's evidence deposition with you to see what might be admissible, and that never happened? Well, I wanted to get in. There was two things that I wanted to get in, Your Honor, based on the exception. Dr. Beatty and Dr. McKee, the defendant in this case, are both members of the American Society of Plastic Surgeons, and the fact that he didn't take an informed consent from this lady when he was removing all of her tissue I thought was just outrageous, especially when he's a member of a group, and this is in Dr. Beatty's deposit, where they give you a form of informed consent to use with your clients. It's about 11 pages, or I'm sorry, not 11, about 10 pages, almost 10, seven or eight pages that goes through all of his stuff. I was, if he didn't use that, he, you know, protested to be a member of that organization. Dr. Beatty, when I took it, when I was cross-examining him, I go, Dr. Beatty, here's the consent form that Dr. McKee used in this case. He says, don't tell me that's what he used as a consent in this case. Don't tell me that, Perica, don't tell me that's what he used. He goes, that's just totally inadequate. That also goes along, and that's the non-retained treater. Did he give an opinion that it breached a reasonable standard of care? He said in two respects. He said he breached the standard of care in two respects, inadequate informed consent, and that he removed excessive tissue. And I didn't get into that too much, but this lady basically looked like a man when he was finished. And if he'd have gone, he went down to like chest level, did not go down to the sternum. If he'd have gone all the way to the sternum, it would be a mastectomy. That's the difference. He left the tissue like, I don't know how to describe it, just the surface and did not go down and try to remove all the tissue like you would if somebody had cancer. And the pictures are in the record. I mean, she basically looks like an overweight man when he was finished with her. And the only thing that he could point to in his office notes was somewhere in his office notes he wrote that my client said that she wanted as much off as possible. But that was within the confines of having a C or a B cut, the worst B cut. And that points me to something else I thought was incredible. In Dr. Marti's testimony, I asked him what a C cup was, and he says he didn't know. And I said, you are holding yourself out as a plastic surgeon doing breast enhancement and reduction. You don't know what a C cup is. And I told the jury that was akin of an author not knowing what a T is. But basically, that's my argument. And I think she was substantially prejudiced just by not having the local doctor, Dr. Beatty, an undertained expert to offer these opinions. And I think he was wrong in barring me from using that witness. I didn't really want to. And I didn't answer your question. I'm sorry, Judge. I didn't really. That was the two things. Those were the two things that I wanted to get out of Dr. Beatty was the accepted loss of tissue and that informed consent that the organizations that they both belong to promoted. He didn't use any informed consent at all. Well, there's a dispute between whether there was an offer of proof for Dr. Beatty's testimony. Well, now, if you look at page the same section that I pointed out to you, it was page 8 of the October 1st recorded proceedings. Judge Matogian, in that little ‑‑ and probably the lines before that. I said lines 2 and 3, but there's lines right before that, probably not partially, on page 7. He says, Freed was making his offer of proof. I told him he could do it now, and he can tell us why. And he says because Dr. Beatty was being barred as a witness outside the presence of the jury. That's on the record at that October 1st report. And, Judge, I don't want to be knocking on court records, but, you know, in Madison County we have, for whatever reason, we have a different court reporter every day so they can balance the workload. And I think Mr. Walter will agree that we had a heck of a time just getting a complete report of proceedings where it was all sequential, but I think it's in the record now. And I don't know if that's the plaintiff's fault or what, but we just had some trouble getting everything in the record. And he had cooperated with me great, and I think I owe him on getting that full record before the court. The defense also contends that the evidence deposition of Dr. Beatty, he says he didn't have the records to render an opinion as to the standard of care. Well, that's what he had. He got him to say that. But in this particular case, Judge, it was only one piece of paper. The office, you know, there wasn't any confirmed consent for him even to look at at all. You know what I mean? He didn't have any kind of, the only consent that I showed Dr. Beatty, and that's what I elaborated on a minute ago, when I showed him that hospital consent form, which is just the consent for surgery, which I think was on the jury, I think the jury got confused. I don't know what really confused them, but informed consent and consent, there was a big confusion there, we think, within the jury. I objected to any message that went back to the jury. And the seventh message, just let me get to that. The seventh message the jury came out, they were out like 15, 16 hours or something, the seventh question they asked was, can we find on one count for the plaintiff and on one count for the defendant? Well, the simple answer for that by the trial judge would be yes. But Judge McCosin, in responding to that simple question, I don't know if the court has that, here's what he said in response to that question. Here's what the question is. Can we have a different verdict on each count? Here's the answer. It is undisputed the plaintiff gave consent to surgery. What you need to decide is whether the plaintiff has met her burden of proof under informed consent. See instruction, and he's got the instruction number, and he sends it back. In addition to this, you know, the instruction was already back there. He singles out an instruction and sends it back. That's not receiving responsive. They never did say yes or no on whether they, and I think that was almost a directed verdict against me on the informed consent. It was, you know, the simple answer was yes. And I think Mr. Ruler was arguing with Judge McCosin saying, Judge, they misunderstood our first question, number one, all along. Well, we don't know if they did or didn't, and it's not the lawyer's place to be in the jury room. I thought that was totally improper, and I thought it prejudiced my client. The last issue, Your Honors, is there was a motion in limine enter to keep out the mention of public aid, and that came that we had stripped it. I don't think, I know Mr. Ruler didn't do anything intentionally, but we gave the transcript to the legal video, you know, how we do the strikes, and they're going to take it out, and they didn't take it out. Now, I didn't, he was, I didn't object at the time because I didn't want to call more attention to it, and I had a motion that was granted, actually two motions, collateral source and the mention of public aid, they were both granted. I thought that was prejudicial as well, and I think either one standing alone is enough to prejudice my client demanding a new trial. Now, they also brought up that I didn't make disclosures or something on my opinions. They had taken my retained expert's deposition in December of 2007 where these opinions came out, and the rule says if it's in the answer to the interrogatory or if it's in the discovery deposition, we don't have to disclose it again. I mean, they were perfectly aware that the two elements were the two I pointed out to you, removal of excessive tissue, and the second was the lack of informed consent. Judge, I don't know if I finished answering your question on that point. That's fine. Anyway, Your Honor, in conclusion, I think either one of these items, there was discretion of using and standing on either one of them. It denied my client a fair trial in this case, and I think she's entitled to a new trial based on that. And that's what I would ask the court to do. Thank you. Thank you. Thank you. May it please the Court, Mr. Farika. Your Honor, it's difficult, I guess, to get in here when you're preparing to argue matters of law and not have the appellant go through the case and try to argue the merits of the case to you as though he should have won and somehow the jury made a mistake. I want you to understand that this case began in 1999 with the surgery that Dr. McKee did on this woman. She was 404 pounds when she came in. She had size 46 DD breasts that hung down to like here. They were enormous. They had caused her 10 years of terrible back pain, neck pain. She had rashes. It was very unattractive. And there is no question that in Dr. McKee's notes, which he dictated in front of her, which is part of the record, and which he then dictated for purposes of the surgery that was done, that she told him she wanted to be rid of as much breast tissue as possible. And there is no question that she consented to this surgery, the breast reduction surgery. She signed consent forms. There is no question about that. This whole idea that farm consent and that there has to be a certain form signed is ridiculous. That has nothing to do with farm consent. Farm consent is the plan of understanding the nature of the surgery and understanding some of the risks associated with it. The only thing that farm consent had that he wanted to introduce to Dr. Beatty, and I'll get into that in a minute, Dr. Beatty never said that was the only standard of care farm. In fact, he said that meant the standard of care that you could use other farms. The point is, the only thing I had in there is a thing that said we don't guarantee anything. So basically it was like, you know, we can't guarantee it's going to look nice afterwards. This whole case is about the fact that she didn't like the result. And the truth is, she got B-cuts. I mean, the problem with Dr. Beatty, five years later, after the surgery, that's when he saw her in 2004, is she had lost 180 pounds. He not only didn't have the records of Dr. McKee, didn't have any of the surgical records, didn't have any of the testimony of the plaintiffs. He saw the patient, didn't have any of the pictures, both before the surgery or after the surgery. He saw her after she had lost 180 pounds. And I really object to him coming and telling you that Dr. Beatty testified that my client deviated from the standard of care by taking too much breast tissue. He never said that. In fact, he said specifically he had no way of getting standard of care opinions when we took his evidence deposition. None. So I just want the court to understand how this case began. 2001 was filed. We had seven case management orders in this case. From 2001 to 2007, repeated violations of the case management order by the plaintiff. Constant motions to compel. And at the very last minute, he wanted to bring in Dr. Beatty as a live witness at trial. That was the whole point. And I objected to it and filed a motion in limine with regard to it. And I bring the court's attention to the judgment potion and the record. Here's what the court said. The court has ruled that the plaintiff will not be able to use Dr. Beatty for standard of care because he stated in the deposition that I read, and that was the evidence deposition, that he could not give an opinion without the records. And the records were provided later, provided later by the plaintiff, who wanted to then use him as a live witness at trial without any disclosure. What page are you on here? I'm on page 7 of my brief, Your Honor. Okay. And it's in the records. It's R249. And therefore, number 8 is allowed. Dr. Beatty will not be allowed to testify as the standard of care. And I understand you are withdrawing him as a witness. He was going to bring him live. He was going to be one of his witnesses. It was going to be another expert opinion. No disclosure. No 213. The doctor had never seen this patient before, hadn't seen any of the records prior when he gave his evidence deposition, had no opinions as to the standard of care with regard to the surgery itself or how it was performed. And he wanted to bring him in live. So the court barred him. And then Mr. Freca says, well, can I use portions of his evidence deposition that don't get passed your rule, which, again, was part of the standard of care. And I said, well, I am. And really, honestly, Your Honor, to go through the evidence deposition, there hardly are any opinions. There are some questions that he asked. For example, Dr. Beatty, how would you have done the surgery? Or what would you have done in those circumstances? That's not standard of care. Did you agree to go over portions of the evidence deposition? No, we never talked about it, ever after that. And that's what's confounding about it. I thought you said in your brief that you agreed to go over his evidence deposition. Oh, I did. The next thing it said, I mean, I don't know. And I said, well, I'm happy to go over it with him if we can. But that never was offered. He never offered to go over it? He never offered to go over it, and we never went over it. Okay, what about this offer of proof that you contend was never made? Well, my understanding of what the offer of proof was is that he was offering the evidence deposition because of the court's ruling that based on the evidence deposition and the fact that the doctor said I don't have any of the records and I can't get the standard of care, that he was introducing that as an objection to the court's barring him from bringing that witness, lying to trial. That's what I understood that to mean. Not that somehow all that evidence deposition was going to come in or something like that. And we never talked about specific paragraphs of the deposition or what could be used because there were lots of objections I made, which I think were proper objections that were never made by the court. Clearly, the trial court ruled that Dr. Beatty's testimony would not be admissible on the standard of care. But is there in the record evidence as an offer of proof of what that testimony would have been? Other than he gave the evidence deposition and he introduced that. And that's all there was, isn't it? Isn't that all there was, the evidence deposition of Dr. Beatty? Right. Well, you read portions of Dr. Beatty's deposition in your case? No. Did you not? No, I elected not to. Okay. So he wasn't hurt from it all by the jury? I would have objected to him. First of all, all the draft doesn't have anything whatsoever to do with standard of care. This lady came in to see Dr. Beatty. She had lost 180 pounds, and I wanted to get Dr. Beatty essentially to testify that after somebody loses 180 pounds, almost invariably you're going to have to do some reconstruction because if he would have left the breast larger, there's no way for a patient to lose 180 pounds and to be in a position where they're not going to need some kind of reconstruction. And really that's essentially what Dr. Beatty was saying in my direct examination. And then as part of the direct examination, Dr. Beatty says, I also don't have any of the records, I don't have any of the pictures that were taken either before or after the surgery. I've seen her five years later. I don't have any of the records of doctors and PE. How do we know all this? Is it marked as an exhibit and in the records? Yes. Okay. The evidence deposition is marked. The whole thing? Right. The whole thing is marked as an exhibit and in it. And then on cross-examination, he tried to elicit testimony from Dr. Beatty. Dr. Beatty never said my client took too much breast tissue. He never made any comments with regard to the surgery or whether it was a proper effect. He said, I wouldn't guarantee that client, a 404-pound woman, any result. And that's basically what he said. But what he did get me to introduce as part of it was this American medical, American plastic surgery consent form that they recommended. And all I'm telling you is the only thing in there that really would have been applicable to this case is a comment that says we don't guarantee, you know, basically there's no guarantees of the cosmetic result. So I suppose that in an informed consent situation, if there's truly an informed consent issue here, it's that there's an argument as to whether my client informed her that he couldn't guarantee that she was going to get a good cosmetic result out of it. Although I can tell you that she asked for B-cup. Anyone can imagine what a B-cup would look like on a 404-pound woman. She's going to have very tiny breasts. That's what she ended up with. And the records, his records clearly indicate, Dr. McKee's records indicate that he did talk to her about the various complications that could occur, including the loss of tissue and bleeding and all kinds of other things. And I think it's disingenuous for them to suggest that there has to be some form that has to be signed for informed consent. That's not true. Did he use this form to cross-examine your client or your expert? He had an expert that testified to it, He identified that form. Yeah. And then he had Dr. Bates. So, I mean, it's not like it would have been duplicative, but Dr. Bates said, and the thing is, I also, on recross, said Dr. Bates admitted that's not the only form that can be used. It's one of the forms that meets the standard of care. You know, you don't have, there's not any one form that's going to be, that's informed consent that wouldn't be acceptable under the standard of care. Talk to me about issue three real quickly. That's the motion in limine where you can't mention public aid or Medicaid. That was done. Those words came out, correct? Medicaid came out in the contents that of not for this surgery, not having anything to do with this case. Was there an objection at that time? No objection was made. It had to do with whether, she had told her other treating physician, one of the treating physicians that we got an evidence deposition from, that she didn't get the breast reduction surgery in the past because it wasn't covered by Medicaid. That was what she said. I didn't get anything done in the past because it wasn't covered by Medicaid. Implied, I guess, this surgery actually was covered by, that she actually didn't either have insurance or she paid for it herself. So I don't think, honestly, I don't think it violated the in limine motion because it had nothing to do with this surgery or the medical bills that were going into this and had to do with prior past medical treatment that she either elected not to have. That's what that particular, and he didn't object to it at the time, it was inadvertent, and to be honest, I don't think there was any prejudice. And clearly it had nothing to do with the surgery that she had because he wasn't even talking about the surgery that she had had by Dr. McKee, the implication of which was if it wasn't covered by Medicaid that she actually had to pay for it. Who asked the question? I think I asked the question of the doctor. I just asked him, he was reciting a history, and I think I asked him, and then she came in and what did she tell him then, and he put that in. And it was going to be eliminated, I don't think it really needed to be, but I agreed to do it, but the guy that did the video apparently left it in. And when it came on, I thought, well, he didn't object to it, and honestly, I don't think it was a violation of his eliminate motion. And if I could briefly then go, I guess, to the third point, which is the instructions to the jury and the notes that were sent out. Your Honor, there is no doubt that the jury was confused. I think it's part of the confusion that occurred in this case because of the use of these forms and the consents and whether you signed this particular form or that particular form. The jury was confused as to whether or not, and their first note was, is oral consent the same as written consent, and did she give oral consent? Well, and the court's answer to that first question was really in error. And I have to admit, when he sent it out, I didn't object to it and I said it was okay, but I did very shortly after that tell the court that I thought that that answer had created a misinformation for the jury. Now they're trying to decide whether this lady gave consent. This isn't a battery case. There was never a pleading of what battery. There's no count of battery. She gave consent to the surgery. There's no question about it. And I go through in my brief very carefully about what informed consent is because the courts in Illinois have clearly indicated that the plan is not even an issue in informed consent. The only issue is what was told to the plaintiff and was that sufficient to meet the standard of care with regard to how much information is given to them, whether they're fully informed of the risks of the surgery. Okay? So that's one thing. But the second thing is, even if you assume that they weren't, so let's say the plaintiff proves that she wasn't fully informed, which I guess in this case would mean that she was not fully informed and her breasts may look too small for her, her large size, and that she may not be satisfied with the cosmetic result, and therefore Dr. McKee should have told her that specifically if you assume that he didn't and if you assume that that was something. Then the rule is that a reasonable person, the question is whether a reasonable person would have been for bond surgery as a result of that, not whether she was, not a subjective test to this particular plaintiff, not whether Carrie Zhang would have said, no, I'm not going to go farther with the surgery. That has nothing to do with the farm consent. The only question is whether a reasonable person would have said, okay, my breasts might turn out to be too small, so I'm going to continue to have the severe back pain for ongoing, including the rashes and everything else, because of the possibility that the breasts may turn out not to be as attractive as I thought they were. And I don't think any reasonable person would have concluded that. The problem is the jury began to look at who gave consent. Did she give consent? Did she give oral consent? Did she give consent? I didn't think they started to think about it. I don't know. You never know what the jury is thinking about. But from that first question, when they asked is oral consent the same as written consent and did she give consent, oral consent, I think they're thinking, did she really know everything and did she give the consent that she needed to knowing everything? That has nothing to do with the law of informed consent in medical law. Did the trial court tell the jury that they have an instruction that says she gave informed consent? Because there was a jury instruction on informed consent. Right. Did the trial court clarify for the jury? Well, then he read you later what the court did and said back to the jury. I objected shortly after he answered that first question, because what he said to them is oral consent is the same as written consent, and it's for you to decide whether she gave oral consent, which is not right. They're not supposed to be deciding whether or not she gave consent at all. That's not an issue in informed consent. That's an issue in bannery, and death is not a bannery. So I objected to the court. I said I think you confused the jury with that instruction. The jury is not supposed to be considering whether she gave consent or not. The jury is supposed to be considering whether or not there was informed consent and, therefore, whether a reasonable person would have foregone surgery had they been properly informed. So the court, after they continued, and every time they came back, and they did come back with a number of questions, and every time they did, I'd say the same thing. Judge, I think they're confused, because there was other questions that they asked about. Well, what did they want to get a transcript when Dr. McKee testified that he actually dictated in front of her with regard to the various things about the surgery, and he dictated his note. And, anyway, I continued to object, and I said, Judge, I think they're confused. And so what Judge Petosian elected to do, and I think it was correct, and I don't see how anyone can contend it wasn't proper, is he said that basically she gave consent. That's not the issue. You're to decide this case under informed consent, which is these instructions, which I previously gave you, and he sent them back again. So that's what he did, which is exactly correct. So he told them, look, you're supposed to decide informed consent, and you're not supposed to decide consent. And I think there's no question that that was appropriate. And then the jury finally came back. But, Your Honors, all of this is under abuse of discretion. The court certainly has discretion with regard to expert witnesses. I think if the courts look at the various things that they're saying that Dr. Beatty, for example, is not allowed to do, they were allowed to elicit from him. One of the things in their brief is they talk about Dr. Beatty not being allowed to testify as to what he would do under the circumstances. Well, that's not standard of care testimony at all, and it's irrelevant. And the case law in Illinois clearly says it's irrelevant. And yet that's some of the testimony that they're allegedly saying was abuse of discretion for not allowing him. And there can't be any prejudice here because, really, there is no testimony of Dr. Beatty. I think it's really irrelevant to the issue that they were already allowed to take all that in for their expert, Dr. Weinberg. I think the only issue was that Dr. Beatty, they were trying to use Dr. Beatty as a last-minute add-on to their experts in this case when they've had seven years to get experts in this case and never did. Well, except for their retainment. So the jury's decision, I think, is absolutely correct. I take exception with the fact that Dr. McKee did something wrong and took too much breast tissue. He was asked by this lady to leave her with a small breast, and he did. And I think the problem is that she lost 180 pounds from funeral poor afterwards, and obviously she lost breast tissue again. So now she ended up with very small breasts. Well, that's what's going to happen. But the problem is when you lose 180 pounds, there's no way, if you don't have large breasts that are sagging, there was testimony about all of that. So Dr. McKee testified, did he testify that he admitted that he told her he was only going to remove 1,000 grams? No. What he said on that is that when he put 1,000 grams on the record, it was for insurance purposes. Because for insurance purposes, in order to get coverage, you have to say I'm going to take a minimum. He said there is no way you can't estimate on a person with 46 DD breasts how much breast tissue is going to be removed. In quantifying the weight, there's just no way. Thank you, Your Honor. Thank you. Rebuttal. I'm going to go in reverse, if I may. Dr. McKee testified that in the operating room, there's a scale where you put the tissue that you're removing as you're removing it. So there's no question that there's a mechanism or a method to decide or to determine how much breast tissue you're removing. She had six pounds on each side. He was supposed to remove a third of that, approximately two, and leave her with four. He left her with nothing. And that's just outrageous. I mean, it's not even close, according to the retained expert. Now, as far as prejudice, again, I want to point the court to that seventh question. Can we decide for the plaintiff on one count and the defendant on the other? And I read what Judge Matosian read. It's not even responsive, and it directs a verdict against the plaintiff, and prejudices are on that count of informed consent. I don't know. Mr. Wolder doesn't know what the jury was thinking back there and why they asked these questions. I don't know, and neither did Judge Matosian. But that's just a – the answer is just not responsive and very prejudicial on that count that they maybe were going for the plaintiff on, because it was shortly after that they gave – we gave the – it was like – I think it was close to 14 or 15 hours when that was given. Then he gave the prim instruction about an hour later, then they came back. I just think that's proof on its face. This thing with Dr. Beatty, Judge Matosian said I was barred from using him as a witness, a deposition or otherwise, is the way I took it. If you look at that page that I cited, it's pretty clear. That's why I put it into evidence or I would have read it. As far as going over it with Mr. Wolder, when he said there was no reason for me to go over it after he said I was barred from using him in the case, and that's what it says on page 8 – or I guess it's page 8, whatever I told you earlier. Page 8, lines 2 and 3 is where he actually says it on the October 1st report of proceedings. Now, getting back to informed consent, one of the other things that – Carrie Zhang was on a diet when she was talking about doing this weight reduction. That's one of the things he should have talked to her about in the informed consent conference. That's what – he should have told her, hey, you're losing weight. Maybe we better postpone this thing. We could have a bad result. He didn't do any of that. I mean, there's no informed consent whatsoever except for that line in the records that says she wants as much office funds. That's the only thing he's got written on her, and then they use this thing on the insurance. Oh, we only put that $1,000 in there for insurance. That's not really true either because in the post-op report or the pre-op report, that's what the nurses set up the operating room for. When they give them that pre-operative report, that's supposed to be an indication of what they need in the operating room and what they need for this. I'm not a doctor, and I don't profess to be, but that's what my understanding was. He didn't do anything like that. He said in his report, I'm taking 1,000 grams off each side, free nipple graft, et cetera, and he just botched it. I mean, he left a lady with 12 pounds of breast tissue with zero flat, described by my expert flat as a pancake. And that's briefly all I have, Your Honor, unless you have any questions. No, thank you. We appreciate your arguments, and we'll take the matter under consideration.